

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

EMR/ALK/JD  *271 Cadman Plaza East*
F. #2022R00781  *Brooklyn, New York 11201*

April 19, 2024

<u>By ECF and E-Mail</u>

The Honorable Sanket J. Bulsara
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    <u>United States v. Omari Scott and Michael Simmons</u>
               <u>Criminal Docket No. 24-158 (KAM)</u>

Dear Judge Bulsara:

      The government respectfully submits this letter in support of its application for the entry of a permanent order of detention as to the defendant Omari Scott, who was arrested earlier this morning.[1]

      Scott is charged by indictment with two counts of sex trafficking, in violation of Title 18, United States Code, Section 1591; murder in the course of sex trafficking, in violation of Title 18, United States Code, Section 2455; and related crimes. The charges arise from Scott's trafficking of victims to work in prostitution at an open-air sex trafficking market along a stretch of Pennsylvania Avenue in Brooklyn, New York (the "Penn Track"), and his orchestration of, and participation in, the murder of Cleveland Clay in connection with a dispute over the control of one such victim.[2]

---

[1] The defendant Michael Simmons is in custody in Louisiana at USP Pollock on federal probation violations and will be transferred to this District for arraignment in the coming weeks.

[2] The government may proceed by proffer in a detention hearing. <u>United States v. Abuhamra</u>, 389 F.3d 309, 320 n.7 (2d Cir. 2004); <u>United States v. LaFontaine</u>, 210 F.3d 125, 130-31 (2d Cir. 2000); <u>United States v. Martir</u>, 782 F.2d 1141, 1145 (2d Cir. 1986).

Given the nature of the crimes charged, there is a statutory presumption of detention, and the defendant poses a significant danger to the community and risk of flight if released on bail. The Court should, therefore, detain him pending trial.

I.   Background

   A.   The Instant Charges

Between approximately January 2021 and June 2023, the defendant had at least three women working in prostitution for him on the Penn Track and other locations, and trafficked at least two of those women, Jane Does 1 and 2, using force, fraud and coercion. Specifically, evidence obtained pursuant to the investigation, including text messages, video surveillance and recorded calls, reflect that the defendant regularly required Jane Does 1 and 2 to solicit customers on the Penn Track and other locations, and to engage in commercial sex acts with those customers in cars or in nearby hotels. The defendant collected the proceeds earned by these women after they engaged in commercial sex acts with customers and threatened them with violence if they did not continue to earn money for him.

For example, in June 2022, the defendant accused Jane Doe 1 of disrespecting him and threatened her, messaging her in substance and in part, "Once again I'm gonna knock u out for disrespecting me." In August and September 2022, the defendant created videos of himself berating Jane Doe 1 in his car, at least one of which he later posted to his Instagram. In one such video, the defendant yells, in substance and in part, "It's all right when you more concerned for my dick than my check right . . . . You know what she was concerned about instead of getting my check? Me being next to another hoe." During the video, the defendant pulls Jane Doe 1 by the hair to show her face to the camera while she cries and repeatedly calls her an "overrated 304," which is a reference to a woman working in prostitution.

In November 2022, the defendant was captured on a recorded call telling an associate who was also engaged in sex trafficking on the Penn Track that the defendant was violent with Jane Doe 1 after she failed to move quickly enough to find prostitution customers at nightclubs in New York City. Specifically, the defendant stated in substance and in part, "this is why I was beating this bitch up tonight." When the defendant's associate responded, in substance and in part, "That's good that you're still doing that cause . . . I stop beating up hoes like that . . . . I'm not saying there's anything wrong with that. I promote it[,]" the defendant responded in substance, "tonight yo like [she] needed it."

In late April 2023, the defendant learned that Jane Doe 2 was planning to leave him to work for Cleveland Clay, who also had women working for him in prostitution on the Penn Track. Video surveillance from April 30, 2023, captured Jane Doe 2 getting out of Clay's car with another female and walking down the street on the Penn Track. Approximately one minute later, the defendant pulled up in his car, got out in the middle of the intersection, violently pulled Jane Doe 2 by the hair and forcefully dragged her into the passenger seat of his car before driving away. That same day, the defendant was captured on a recorded call telling an associate, in substance and in part, "I don't got no hoes right now. . . my little Spanish

2

bitch blew on me . . . I'm bout to violate that bitch. . . I'm about to do her something crazy. . . I'm not respecting this shit. . . . I'm about to kill this bitch!" The defendant went on to explain that Jane Doe 2 "chose up," which is a reference to leaving one pimp for another.

In the early morning hours of May 1, 2023, the defendant and Michael Simmons were captured on video engaged in a heated argument with Clay along the Penn Track. That dispute ultimately culminated in the defendant and Simmons deciding to murder Clay, which Simmons carried out by shooting Clay multiple times at point blank range later that morning at a parking lot on the Penn Track. A few minutes before the murder, surveillance video captured the defendant and Simmons gathering with Jane Doe 2 and another female outside of a laundromat located at 762 Sheffield Avenue, near the Penn Track. After meeting with the defendant, Simmons walked off to carry out the murder. As reflected on surveillance video, Simmons approached Clay in a parking lot a short distance from the laundromat and shot Clay at least five times at close range. Simmons then fled back to the laundromat where the defendant was waiting. When he got back, Simmons told the defendant in substance, "He's down . . . he's down!"

Clay succumbed to his injuries and died on the afternoon of May 1, 2023. After Clay's murder, Jane Doe 2 continued to work for the defendant in prostitution.

At approximately 5:00 a.m. on April 19, 2024, federal agents arrested the defendant outside of the laundromat at 762 Sheffield Avenue, near the Penn Track.

B. The Defendant's Criminal History

The defendant has several prior felony convictions, including (1) a 1999 conviction for attempting to knowingly make or possess dangerous contraband in prison in the first degree, in violation of New York Penal Law Section 205.25; (2) a 2002 conviction for assault in the second degree, in violation of New York Penal Law Section 120.05; (3) a 2013 conviction for having a weapon in a motor vehicle, in violation of Connecticut General Statute Section 29-38; and (4) a 2016 conviction for sale of a controlled substance, in violation of Connecticut General Statute Section 21a-277(b), and criminal possession of a weapon in violation of Connecticut General Statute Section 53a-217, and related crimes. The defendant also has five misdemeanor convictions.

II. The Bail Reform Act

Under the Bail Reform Act, Title 18, United States Code, Sections 3141, et seq., federal courts "shall" order a defendant's detention pending trial upon a determination that "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(e). A finding of risk of dangerousness must be supported by clear and convincing evidence and a finding of risk of flight must be supported by a preponderance of the evidence. See United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985).

In cases like this one, charging an offense under Title 18, United States Code, Section 1591, "it shall be presumed," subject to rebuttal by the defendant, "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3)(D). The presumption means that the Court must initially assume there is "no condition or combination of conditions that will reasonably assure the appearance of the person as required and the safety of any other person and the community." Id. The defendant must come "forward with evidence that he does not pose a danger to the community or a risk of flight." United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001). Even if the defendant were to meet his burden of production, "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." Id.

Whether detention is sought on the basis of flight or dangerousness, the Bail Reform Act lists four factors to be considered in the detention analysis:

(1) "the nature and circumstances of the offense charged. . .";

(2) "the weight of the evidence against the person";

(3) "the history and characteristics of the person, including . . . the person's character, . . . past conduct, . . . [and] criminal history, and record concerning appearance at court proceedings"; and

(4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."

18 U.S.C. § 3142(g).

The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).

III. Argument

As noted above, there is a presumption that there are no conditions of release that would reasonably assure the defendant's appearance and the safety of the community. See 18 U.S.C. §§ 3142(e)(3)(D) and (E); see, e.g., United States v. Andrews, No. 19-CR-131 (PAE), 2020 WL 3182911, at *1 (S.D.N.Y. June 15, 2020) (presumption applies in all § 1591 cases). The defendant cannot rebut that presumption, regardless of any bail package that may be proposed, because the relevant considerations under the Bail Reform Act clearly support a finding of dangerousness and risk of flight.

4

<u>First</u>, the charged offenses are extremely serious. 18 U.S.C. § 3142(g)(1). The defendant has trafficked multiple women for his own financial benefit. He threatened them and forcibly took money from them—actions that were part of a pattern of regularly threatening and prostituting women to extract more money from them. When Jane Doe 2 tried to leave the defendant for Cleveland Clay, the defendant and Simmons murdered Clay rather than relinquish control. The first § 3142(g) factor therefore weighs strongly in favor of detention.

Moreover, the charged offenses carry significant penalties that give the defendant a strong incentive to flee. Specifically, the defendant faces a mandatory minimum sentence of 15 years on each sex trafficking charge and a potential sentence of life in prison or the death penalty on the charge for committing the murder of Cleveland Clay in the course of sex trafficking. Because he is charged with a premeditated murder, the defendant's advisory United States Sentencing Guidelines range is life imprisonment. These penalties give the defendant an overwhelming incentive to flee and to obstruct justice. <u>See</u> <u>United States v. Jackson</u>, 823 F.2d 4, 7 (2d Cir. 1987); <u>Martir</u>, 782 F.2d at 1147 (defendants charged with serious offenses whose maximum combined terms created potent incentives to flee); <u>United States v. Cisneros</u>, 328 F.3d 610, 618 (10th Cir. 2003) (defendant was a flight risk because her knowledge of the seriousness of the charges against her gave her a strong incentive to abscond); <u>United States v. Townsend</u>, 897 F.2d 989, 995 (9th Cir. 1990) ("Facing the much graver penalties possible under the present indictment, the defendants have an even greater incentive to consider flight."); <u>United States v. Dodge</u>, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (possibility of a "severe sentence" heightens the risk of flight).

<u>Second</u>, the weight of the evidence against the defendant is strong. The government intends to prove the defendant's guilt at trial through, among other things, (1) witness testimony, (2) text messages, photographs, videos and other materials recovered from cellular telephones and iCloud accounts of the defendants and their coconspirators and victims; (3) video surveillance; (4) recorded and intercepted phone calls; and (5) crime scene and autopsy evidence, only a fraction of which is outlined above.

<u>Third</u>, the defendant's history and characteristics weigh heavily in favor of detention and show the seriousness of danger posed by the defendant were he to be released. In addition to his repeated use of violence against trafficking victims in the instant case and the premeditated murder of Cleveland Clay, the defendant has a history of felony assault and weapons possession convictions.

In sum, the defendant before this Court today cannot be released without risking the safety of the community and the likelihood that he will not return to court as required. The defendant should, therefore, be detained.

IV.   <u>Conclusion</u>

For the reasons set forth above, the government respectfully submits that no condition or combination of conditions will properly assure the safety of the community or the

defendant's return to court if the defendant is released on bail, and therefore requests that the Court order that the defendant be detained.

                          Respectfully submitted,

                          BREON PEACE
                          United States Attorney

By:        /s/
                          Erin Reid
                          Anna L. Karamigios
                          Joshua Dugan
                          Assistant U.S. Attorneys
                          (718) 254-7000

cc:    Clerk of the Court (by ECF)
       Counsel of Record (by ECF)